UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

In re:

SHIRLEY HOEL and
ROGER HOEL,

Debtors.

Case No. 20-10509-12

---

# MEMORANDUM DECISION

Shirley and Roger Hoel ("Debtors") filed a Chapter 12 petition. The Standing Chapter 12 Trustee ("Trustee") filed a Motion to Dismiss the case ("Motion"). The question presented is whether the Debtors satisfy the Chapter 12 eligibility requirements under 11 U.S.C. § 101(18)(A)(i).

## BACKGROUND

Debtors' gross income in 2019, the year preceding the filing, was $47,650 excluding both social security ($30,748) and insurance sales ($4,802). Debtors claim their farm income has two components—cattle sales and breeding ($14,650) and horse boarding ($33,000). Debtors say the risks related to boarding horses are that if a horse becomes ill, they may have to transport it to a vet. Further, if the price of hay or feed rise, the Debtors' cash flow may tighten. Finally, Debtors suggest that if they have to transport a horse to a vet, they "bear the time burden when pulled away from the farming operation."

Debtors have not provided an accounting of the payments received from boarding. No boarding contracts or agreements have been supplied. It appears there are two boarded mares, five boarded geldings, and three boarded heifers.

The Debtors also hold an interest in a business called Central Wisconsin Save the Animals Group, Inc. It is a nonprofit. It provides rescue services for neglected or abused horses and other small animals. Donations are solicited and, apparently, are identified as deductible. Fundraising events may also be part of the operation of the nonprofit.

## DISCUSSION

Under 11 U.S.C. § 109(f), "Only a family farmer . . . with regular annual income may be a debtor under chapter 12 of this title." Chapter 12 of the Bankruptcy Code provides for the adjustment of debts of a "family farmer" as the term is defined in the Code. The relevant parts of section 101(18) state:

> The term "family farmer" means—
>
> (A) individual or individual and spouse *engaged in a farming operation* whose aggregate debts do not exceed $10,000,000 and not less than 50 percent of whose aggregate noncontingent, liquidated debts . . . on the date the case is filed, arise out of a farming operation . . . *and* such individual or such individual and spouse receive from such *farming operation* more than 50 percent of such individual's or such individual and spouse's gross income for— (i) the taxable year preceding [the date the case was filed]. . . .

11 U.S.C. § 101(18) (emphasis added).

> The term "farming operation" includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state.

11 U.S.C. § 101(21). This list is not exclusive. Rather, given the remedial purposes of Chapter 12, it is to be broadly construed. *See In re Watford*, 898 F.2d 1525, 1527 (11th Cir. 1990); *In re Poe*, 2009 Bankr. LEXIS 2068, 2009 WL 2357160, at *3 (Bankr. N.D. W. Va. July 29, 2009); *In re Sugar Pine Ranch*, 100

2

B.R. 28, 31 (Bankr. D. Or. 1989). But the construction is not so broad "so as to eliminate the definition altogether by bringing in operations clearly outside the nature or practices one normally associates with farming." *In re Cluck,* 101 B.R. 691, 695 (Bankr. E.D. Okla. 1989) (internal quotation omitted).

The Debtors concede that in the second or third taxable years prior to filing this case, they did not receive more than 50 percent of their gross income from a farming operation. So the relevant inquiry focuses on their 2019 income and its source.

To be eligible for relief, an individual must be "engaged in a farming operation" when the Chapter 12 petition is filed. Two approaches have developed since the passage of Chapter 12 to analyze what is a farming operation. One approach focuses on whether the operation is mainly service oriented, and the income is a fee. The other approach focuses on whether the operation involves traditional farming risks—fluctuating market prices, feed prices, uncertain weather, risk to livestock from disease and injury, and upkeep of the animals.

Two main standards have evolved for determining whether an individual is "engaged in a farming operation." In *In re Armstrong,* the Seventh Circuit interpreted section 101(18) to mean that only those farmers whose activities involved the inherent risks and cyclical uncertainties that are associated with farming were protected from involuntary Chapter 11 proceedings. 812 F.2d 1024, 1027 (7th Cir. 1987). As noted by one treatise, "A significant factor in a court's analysis of whether a particular activity constitutes a farming operation

is whether the debtor bears any of the inherent risks traditionally associated with farming." 2 Collier on Bankruptcy ¶ 101.21 (16th ed. 2010). *See also In re McNeal,* 848 F.2d 170, 171 (11th Cir.1988) (finding that a debtor's income did not arise from a "farming operation" because his business activities were not exposed to the inherent risks and cyclical uncertainties traditionally associated with farming).

The *Armstrong* court clearly established that the view of what is a farming operation must be pragmatic. *Armstrong,* 812 F.2d at 1026. "Implicit in [the definition of farming operation] is the inclusion of general activities inherent in farming and . . . the means . . . necessary to perpetuate the farming operation the definition speaks of." *Id.*

Nearly all of the cases discussing the meaning of "farming operation" are more than two decades old. They sometimes assume a standard that fails to recognize the changes in the production practices and business arrangements used to cultivate plants or animals. As noted by a 2017 USDA publication, "Farmers [have] altered how they manage risk, relying heavily on contracting, more complex forms of legal organization, and Federal crop insurance."[1]

Considering the new risk environment in agriculture, high machinery replacement costs, and aging farm owners, custom farming is an example of a viable method of accomplishing crop production. Custom farming is used

---

[1] Bob Hoppe, *How the Farm Business Has Changed*, USDA, (Feb. 21, 2017), https://www.usda.gov/media/blog/2012/01/10/how-farm-business-has-changed#:~:text=Over%20a%20relatively%20short%20time,in%20production%20to%20larger%20farms.

extensively in the Midwest. For the custom farmer, it may provide a way to retain machinery used by that farmer by generating more revenue to service home farm debt or machinery costs. The custom farmer, for example, provides the equipment and labor in exchange for a fee. In some cases, the fee is a fixed sum, but in others there can be a base sum and a percentage of the profits from the harvest and sale of the crop.

The same factors may lead to scaling back their operation, the sale of machinery or land by a farmer, or temporary rental of some of the farmer's land to address financial trouble. As acknowledged by the *Armstrong* court, it would be "illogical, undesired and unnecessary" based solely on those actions for a debtor to be considered a non-farmer. *Armstrong,* 812 F.2d at 1027.

In *Poe,* the Bankruptcy Court for the Northern District of West Virginia concisely summarizes the cases discussing whether the boarding or training of horses constitutes a "farming operation." 2009 WL 2357160, at *3-5. As noted, the cases are mixed. Two cases have determined that type of operation is not a farming operation,[2] and two cases have concluded that such activities do constitute a farming operation.[3] The *Poe* case decided that raising horses was farming but boarding was not. *Poe,* 2009 WL 2357160, at *6.

---

[2] *In re McKillips,* 72 B.R. 565 (Bankr. N.D. Ill. 1987); *In re Cluck,* 101 B.R. 691 (Bankr. E.D. Okla. 1989).

[3] *In re Showtime Farms, Inc.,* 267 B.R. 541 (Bankr. E.D. Tex. 2000); *In re Buchanan,* 2006 U.S. Dist. LEXIS 50968, 2006 WL 2090213 (M.D. Tenn. July 25, 2006).

Central to all the decisions is (1) analyzing whether the activities undertaken are of the type that someone would perform in connection with the business of growing crops or raising animals, and (2) weighing the uncertainties of farming like the "vagaries and whims of weather and pestilence, yield and demand"[4] and the cyclic and unpredictable income generated.

The *Poe* court thought the series of cases applied different approaches. It described the first approach as:

> [focusing] on the following factors: (1) the debtors' operations were primarily service-oriented as opposed to being self-contained farming operations which produce agricultural goods for consumption; and (2) where the measure of a debtor's compensation is a fee rather than a share of the profits from some future sale, the debtor's profits are not at the mercy of the weather, the farm economy, or other uncontrollable circumstances of farming—any such effect being minute and indirect.

*Poe*, 2009 WL 2357160, at *4.

The second approach was described by *Poe* as focusing on traditional farming risks, such as "(1) fluctuating market prices, (2) feed prices, (3) uncertain weather, (4) risk to livestock from disease and injury, and (5) upkeep of the animals." *Poe,* 2009 WL 2357160, at *6.

Closer analysis, however, suggests that all the cases have a consistent approach merely couched in differing language. All the courts review the activities to compare them to the activities required to grow or produce crops or livestock. Then the risk factors assumed by the debtor are examined. Does

---

[4] *Armstrong,* 812 F.2d at 1030.

fluctuation in market prices materially impact the debtor? Does the debtor bear the risk of changes in the cost of feed, seed, or fertilizer? Does the risk of disease or injury threaten the income or expenses of the debtor? Are there factors like weather that are outside the debtor's control? Is the debtor's income based on a fixed fee or rate of payment or is it subject to uncontrollable events?

Here, the Debtors have income from cattle sales and breeding. They own the cattle. The risks of fluctuating feed prices and other upkeep costs are borne by Debtors. Fluctuating market prices for cattle sales or breeding impact Debtors. They must pay any veterinary bills and solely bear the risk that disease or injury may affect the income derived from sales and breeding. That income, however, is only 30% of the total income they claim flows from farming.

The balance of the income derives from boarding horses. Debtors suggest that if a boarded horse becomes ill or injured, they would "bear the burden of transporting the horses to the vet, and bear the time burden when pulled away from the farming operation." If transporting the horses to the vet was part of the farming operation, they would be not "pulled away" from it. Debtors, apparently, receive a flat fee for boarding since they argue they bear the risk of tightened cash flow if feed prices or other costs rise. Yet they have absolute control over establishing the terms of the boarding agreements. They could choose to terminate the agreement if its terms were onerous or they could

include adjustments to the fee if prices increase or if extra services such as transporting a horse were required.

As noted, no boarding agreements or contracts have been provided. There is no indication Debtors are compensated by the owner of the animals they say they board, but it is clear the Debtors claim they do not own the animals. In fact, it appears the Debtors operate a nonprofit taking in neglected or abused animals. While the care of such animals is laudable, it is also a volunteer effort assumed by the Debtors with no expectation of compensation by the owner of the animals. Instead, Debtors rely on charitable contributions.

While both a family farmer and a boarding operator may face some of the same risks, the effect of those risks is different for each. The "family farmer" bears all the risks of raising horses. If an animal is lost to disease or serious injury, the family farmer receives no profit on the animal and has lost all that he or she has invested in it. In contrast, while profits from a boarding might vary if an animal dies or is seriously injured, that is a short-term loss until a new boarder is located, and there is no meaningful expense to replace the animal. If market prices for feed increase, the operator of a boarding facility could simply pass this cost on to the owner. The family farmer, on the other hand, bears this risk alone and it would lead to less profit or no profit in the future sale of the animal.

## Conclusion

For these reasons, the Trustee's Motion to Dismiss is granted.

8

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: July 20, 2020

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge